Good morning, Your Honors. My name is Carly Sager. I'm a certified law student, and I'm before this court with my supervising attorney, Mike Lozo. We represent Appellant Center for Biological Diversity in the US Forest Service, or I'm sorry, the Sierra Club. Your Honors, the plain and simple fact is that the Environmental Impact Statement does not discuss, analyze, or substantively mention this fundamental, critical debate on the foraging habitat needs of the northern goshawk. This debate boils down to what sort of conditions the goshawk prefers to hunt in. Does it prefer to hunt in an old-growth forest, what is known as a forest habitat specialist, or is it perfectly fine to hunt in a variety of conditions, anything from an open field or old-growth? That's the position the Forest Service takes in a document entitled, The Management Recommendations for the Northern Goshawk in the Southwestern United States. The briefs, the parties in the briefs refer to this document as the MR&G. The management recommendations were prepared in 1992 and were prepared exclusively by Forest Service staff. The Environmental Impact Statement relies on the assumptions in this document and every alternative presented in the Environmental Impact Statement. On the other side of the debate are state and federal wildlife agencies who object to these assumptions. They believe that the goshawk instead is a forest habitat specialist, and they put forth these objections to the assumptions in response to the Forest Service. For example, Fish and Wildlife Service prepared in a letter, stated in a letter, that the fundamental premises of the management recommendations are poorly supported and are often contradicted by the best available evidence. The Arizona Game and Fish Department also raised these concerns in a critique of the management recommendations. This critique is called, The Review of the U.S. Forest Service Strategy for Managing Northern Goshawk Habitat in the Southwestern United States. The parties in their briefs refer to this as the AGFD Review. In this review, the Arizona Game and Fish Department raised objections to the foraging assumptions and open forest conditions that are advocated in the management recommendations. They believe that the physical characteristics enabled the goshawk to better hunt in old-growth forests. However, the only thing that the Forest Service can point to in the Environmental Impact Statement that raises this debate is this brief comment that appeared first in the draft Environmental Impact Statement and then again verbatim in the final Environmental Impact Statement. And I quote it for you now. A few commenters expressed concern that the proposed standards and guidelines for the Mexican spotted owl and northern goshawk are grossly inadequate to protect the birds. That's it. That's the only statement in the draft in the final Environmental Impact Statement that captures this fundamental and important debate. Which page are we at? That is on page 993. 993. Yeah. That's it. That's the only summary that the Forest Service can point to as raising this critical debate. A few commenters doesn't tell you that this is the product of agency experience, scientific research, expressed concern that the proposed standards and guidelines, what were these concerns? Were they credible? What was the quality? What was the nature of them? Instead of informing the public about this critical debate, the Environmental Impact Statement buries it, never informing the public, which is an important component of the decision-making process. Your Honors, under NEPA regulations, the Forest Service has a duty to assess and consider comments both individually and collectively, including reasonable opposing views, stating its response to those reviews in the Environmental Impact Statement, in the four corners of the NEPA document. Despite the attempts of the U.S. Fish and Wildlife Service and of the Arizona Game and Fish Department, appellants, and others to bring this issue, this important fundamental issue, into the four corners of the document, it remained silent. In fact, the Arizona Game and Fish Department submitted this review to the Forest Service not once, but twice in the NEPA process. First in response to the scoping report, and then again in response to the draft Environmental Impact Statement, because the agency felt that the Environmental Impact Statement did not adequately discuss this issue. However, when the Forest Service chose to reprint this comment letter in the final Environmental Impact Statement, it redacts the entire review from the Environmental Impact Statement. Instead of broaching and raising this debate into the public view, it merely states the title, and I'll read it to you again, Review of the U.S. Forest Service Strategy for Managing Northern Godstock Habitat in the Southwestern United States. And then it offers only this vague statement, and I quote again from the document, This document was prepared by the Arizona Game and Fish Department in 1993. The Forest Service considered an extensive review in 1994. Both documents have been included in the planning record, but because of their extensive size are not reprinted in the final Environmental Impact Statement. Mr. Hager, I think it might help me if you would start with the fourth issue that you have on review, because as I understand about the way the argument progresses here, essentially the government says you're missing the forest for the trees. I understand them to be saying that in order to meet the needs of the Gossack, we have to have older, we recognize that there has to be older and more mature trees that are protected in our forest plan, and we've done that. We've given you alternatives, D and G, that are really going to do that. And I need to know why it is that that response doesn't have bite. Your Honor, the alternative section must present a reasonable range of alternatives. You would think that given all of the opposition, all of the critiques on these assumptions, that one, like at least one of these alternatives, would incorporate the forest habitat specialist approach. None of them do. They're all based... They say we gave you D and it was precisely what Arizona and New Mexico said they wanted, and why doesn't that meet your needs here? Why doesn't that meet the requirements of their own regulations, and of the jurisprudence to have appropriate alternatives? Because alternative D, regardless of any... First of all, we don't know if alternative D actually addresses the forest habitat specialist issue. Even if it incrementally adds more old growth, it doesn't, in its construction or even on its face, present or represent this issue. It says in the environmental impact statement that all of the alternatives are based on the management recommendations. How can alternatives that are based on the management recommendations, including alternative D, both be based on those alternatives and also provide opposition or incorporate a fundamental debate or opposition? Well, their response is because the management recommendations were an improvement over the status quo, and that formed the floor, and then we get D, which is everything Arizona and New Mexico asked for. So what's missing? Well, what's, Your Honor, what's missing, first of all, is a reasoned discussion in this document of a fundamental dispute. Before the management recommendations, there was nothing there protecting the Northern Guise law. So, yes, the management recommendations are an incremental improvement, but that doesn't mean that the Forest Service cannot comply with the regulations of NEPA, that they, first of all, include a reasoned discussion of this fundamental debate, and then also in their range of alternatives, at least consider in one of these alternatives a Forest Habitat Specialist approach. Did anybody say to them, we want you to change the vegetative stages five and six so that they're not 20 percent each, they're 40 percent each, I mean, is there some particular alternative you put forward that you wanted them to consider that they refused to say, you know, we're not going to consider that and give you a reason for it? There's not a specific one the center put forward. However, a potential alternative would have been one that took to heart those 5,400 acres that were set aside for foraging needs and taken a Forest Habitat Specialist approach. I mean, even looking facially at the text of Alternative D, it says that it advocates a mosaic of vegetation structural stages, a mosaic of different types of variety conditions. On the face of that, that is the definition of a Forest Habitat Generalist, not one that says the approach taken here is one that prefers old growth. I thought their concern about the alternative preferred in the arguments for further protection of the northern Gossok was that preserving that much old growth would create more risk of insect and disease destruction of the forest. I thought that's what they were talking about on page 961, for example, among other places. Your Honor, I am familiar with that argument. And, yes, the Forest Service – I would think you would be. It's in the environmental impact statement. Right. Yes. So why doesn't that show that they thought about it and they thought, well, balancing the northern Gossok's habitat needs against the fire and insect damage concerns that result in spread of disease and forest fires and such. Why doesn't that show they gave it the hard look required? We do have this very deferential standard of review we're supposed to apply. Right. Your Honor, because although the Forest Service must balance considerations like insects, like fuels reduction, they're still required to take a hard look in the four corners of the NEPA document. Here's a fundamental debate that even if the Forest Service considered behind closed doors and in interagency memos or in letters and responses to these agencies, still don't appear in the face of – in the four corners of the document. It's just not there. A reader looking at it would have no idea that a major assumption that underlies every alternative and is assumed all through the environmental impact statement has some reasonable opposing opposition. There's just no hint of it. But that's your first three issues. Just assume for the purpose of the argument that we said, yeah, you're right on issues one, two, and three. They made a mistake. They should have acknowledged this dispute. Why did they have to present a different alternative? Because nobody's saying to them that I'm aware of, yeah, you know, in order to take – in order to protect the specialist characteristics of the GOSHOP, we want you to do this, this, and this as an alternative to your plan. Because, Your Honor, even assuming that it would have been discussed in the environmental impact statement, the purpose of the alternative section is to be able to provide alternatives to compare and contrast those that are even the preferred alternative by the Forest Service. So what are you – and this is where I start to interrupt before. So what are you suggesting in a concrete way should have been done in order to satisfy the Forest Service's obligation under NEPA to provide a reasonable range of alternatives? Should they have had a no-action alternative where they leave the forest as it is so that sufficient oil growth is there? Should there have been – I mean, what – should they have adopted – the name of your scientist escaped me that wrote the original letters to the MRN to – right? Should they have adopted what he thought? Should they have incorporated some of the subsequent studies that followed on the management recommendations? I mean, what – concretely, what is it that they should have done differently than what they did to satisfy their legal obligation? Your Honors, I believe some of – many of the things you just suggested could have been concrete ways to do it. And I don't think that the position here advocates a single right way of doing it, like one exact text. However, to have one alternative that incorporates and encapsulates that debate, one that says, you know, for example, the one I gave you before, that the 5,400 acres around one nesting pair of goshawk takes a forest habitat specialist approach and assumes that they are best able to hunt in old growth, not in a mosaic of varietal structures. Counsel, why doesn't page 972 do the job in terms of consideration of the alternatives? What impressed me there was it looked like they were really giving a hard look to this particular bird, the northern goshawk, and what they were saying is that you've got a problem that if you preserve as much old growth possible for the northern goshawk, then the Mount Graham red squirrel will be at greater risk to wildfires. And they say that the health of the herbaceous and shrub components of the ecosystem – there they're talking about insects and disease spreading if you don't have some thinning – is also important for the prey species associated with the Mexican spotted owl on the northern goshawk. And then they're saying ecologically it makes little sense to limit the utilization rate guidelines to only Mexican spotted owl and northern goshawk habitat. Alternative G may impact, but no species will trend toward federal listing, and there will be no loss of viability. The way I read this – now, I may have misread it, and you'll educate me if I have – but the way I read it is you can't take optimal care of the northern goshawk without creating other ecological risks and harms to other species, leaving aside the human species. And as a result, there has to be some balancing here. And they've tried to do this, and they know that it's not optimal for the northern goshawk, but it won't be so impacted negatively as to be listed as an endangered species or – I forget what that other category is called that's just short of that. It looks like a hard look. What am I missing? Your Honor, the Forest Service – we respect the Forest Service's obligation to do that. However, it's a conclusory science. I mean, it doesn't present these major assumptions. A reasonable reader – I look at this – I've never read a scientific article that wasn't conclusory in some respect. I read articles sometimes in Journal of the American Medical Association and New England Journal of Medicine, and they don't tell me enough about how the sample was gathered, the population was gathered. It's conclusory. You can always nitpick and say they should have said more. But we don't get to grade their papers. We just get to decide whether they gave it a hard look under a very deferential review standard. Yes, Your Honor. A hard look, though, would require that reasonable opposing views are discussed and analyzed in the text. And the statement that you pointed out that you read to me, being a reader of it, being a reasonable reader, I just don't see the debate presented there in a way that the public would be able to provide input and in a way that would let them know what's going on with this major forest amendment plan or amendment of the forest plan. So because of that, because you're unable to look at this and figure out that there's this dispute about one of the major assumptions that are going on, it causes the environmental impact statement to be inadequate. It doesn't fulfill the goals of informing the public as required under NEPA. And then as a result, because this public input process is missing, it doesn't lead us in a direction of informing our decision makers. Your Honor, I notice I'm running out of time. So if I could just summarize and hopefully save some time for rebuttal. The environmental impact statement in this case, it fails to take a hard look at the signs made available to it during the NEPA process. It does not include a reasoned discussion of objections that were lodged by credible agencies, by appellants, and by even the U.S. Forest Service's own staff member, Dr. Crocker Bedford. It doesn't consider alternatives that don't rely on the management recommendations, recommendations that were the subject of scientific debate and objections. And as a result, the environmental impact statement in this case does not inform the public of this debate. It doesn't do its job in informing the decision maker because it takes out that vital piece of public input. It's for this reason that we ask this Court to issue an order vacating the District Court's order, vacating the Forest Service's record of decision and remanding this matter for further action. Thank you, Counsel. Thank you. Counsel, please proceed. Morning, Your Honor. May it please the Court. My name is Andrew Smith. I'm with the United States Department of Justice, and I represent the Forest Service in this case. The issue before this case, as Your Honor suggested, is whether the Forest Service took a reasonable approach and took a hard look at the potential environmental impacts. Isn't that a later issue when we get to the question of the alternatives at the threshold? Isn't it really just a straightforward legal issue that the agency has to follow the regulations? No, Your Honor. The regulations drafted by the Council on Environmental Quality that implement NEPA and that are to be followed by Federal agencies in preparing EISs are not rigid regulations. They provide for flexibility, and they provide the agencies with various ways to accomplish the goals of NEPA, which is to make the decision-maker well-informed about the agreement. I agree that they're process regulations, but that doesn't mean you don't have to follow them. No, no. And I'm not suggesting that at all. I'm just suggesting that they're not rigid in the way that the agency can go about accomplishing the goals. What do you do about this Reg 1502.9b? Final environmental impact statements shall, that's a mandatory word, respond to comments required in Part 1503 of this chapter. The agency shall, again they use the mandatory word, discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response. Could you explain why the agency was not obligated to provide further discussion of the opposing view that it rejected? Well, Your Honor, if you look at the regulations as a whole, you also have to take into consideration Section 1503.4, which says, 1503.4, and that says, an agency preparing a final environmental impact statement shall assess and consider comments both individually and collectively and shall respond by one or more of the means listed below, stating its response in the final statement. The possible responses are modify the alternatives, develop and evaluate another alternative, make factual corrections, supplement the analysis. So there's various ways that the agency can accomplish the goal of addressing opposing opinions. And in this case, what the agency did, it knew going into the NEPA process, before it even prepared the draft environmental impact statement, that there was an opposing viewpoint out there by the state game and fish agencies. Oh, so you're saying if what they do is they modify alternatives, then they don't have to supplement, improve, or modify the analysis because there's one or more. Yes, it's a very flexible regulation. It's just that the agency has to approach the problem in the way that it sees fit. There may be more than one reasonable way of approaching the issue, but certainly NEPA and certainly the standard of review under the Administrative Procedure Act for this Court does not say that it has to take the best way. It doesn't have to put in color slides in the EIS or do something like that. It just has to take a reasonable approach. And that's what the Forest Service did here. They recognized the issue, the debate up front. They had their own interpretation. Isn't the regulation in 1502.9b unnecessary? No, Your Honor. It says they shall address the comments. And in the shall address. It says they shall address responsible opposing views. It doesn't even address comments. Right. Well, if you're going to make a distinction there, then they did that as well, the responsible opposing view being that of the state game agencies. And the way they did that was they allowed the agencies to participate in the process, develop an alternative that was different than the Forest Service's alternative. Now, plaintiffs have suggested that the game and fish agencies were somehow hamstrung by the fact that they started with the management recommendations for the northern goshawk that were developed by the Forest Service. But that's not the case. The case is that there was a debate back and forth between the agencies prior to the preparation of even the draft EIS. The Forest Service got together with these game agencies, including the U.S. Fish and Wildlife Service, Arizona Game and Fish Department, and New Mexico Department of Fish and Game, and they prepared another alternative. Now, the suggestion that somehow the Arizona Game and Fish Department was dissatisfied with its own alternative that it had worked on is belied by repeated statements by that agency throughout the record. Before the draft EIS was even prepared, the Arizona Game and Fish Department said, and I'm quoting from a letter that's at volume one of the ER at page 78, the Game and Fish Department said, the department believes that application of the GIT, that's the interagency group, recommendations will not only enhance habitat conditions for the goshawk and its prey species, but will also address the needs of other species. In their comments on the EIS itself, on the draft EIS, the agency said, the department believes that incorporating the management recommendations described in Appendix D, which ultimately became Alternative D and finally EIS, and to plan amendments for Ponderosa pond type, excuse me, will address many of our concerns regarding impacts to other species, while also addressing the habitat needs of goshawks. Then finally, in response to the final EIS, they commented yet again, and the Arizona Game and Fish Department again said, the department believes that Alternative D is sustainable over the long term and addresses the habitat needs of a wide variety of species, such as including goshawks. So, excuse me, Your Honor. If it were the case that somehow Arizona Game and Fish Department were still dissatisfied with its alternative as not meeting its view of what the goshawk needed, this habitat generalist versus habitat specialist, it strikes one hard to understand how they would say that that alternative met the habitat needs of the goshawk repeatedly throughout the record. So, in fact, there is an alternative in the EIS, in the draft EIS. It was modified in response to the comments by the Game and Fish Agencies, verbatim presented by the Game and Fish Agencies in the final EIS that presented the Game and Fish Agencies' view. Is there an alternative that presents Dr. Crocker Bedford's view? If you read Dr. Crocker Bedford's letter, I believe there is. Where is it? Which is it? Well, I would say it's both. I mean, he gave viewpoints about the MRNG, which is Alternative G in the end, and he gave it high praise for certain aspects, and then he said, well, in some aspects it leaves small patches and we think there should be some large patches. Well, that's what Alternative D does. The Game and Fish Agency does that. That is a major difference between the two alternatives. Would I find troubling about this case, aside from your now position that NEPA is flexible and not rigid because it's never been so interpreted? In fact, this is the first time I've ever even heard the government argue that all this mandatory language and requirements of what needs to be in the EIS and the ROD, that they're somehow just look at them flexibly and remap. But I'll just put that aside for a second. What really troubles me is that I did read all of these documents that you published for public comment, and nowhere in there is this fundamental debate that seems to be at the core of what this case is about, which is, you know, is the GOSOC a generalist or a specialist, and which view prevails. And there seems to be a lot of scientific studies after the management recommendations that haven't been incorporated in there. And there's one vague reference. I can't remember which document. But there's no statement that certain responsible scientists take the view that what you have to do is have this certain old growth forest in order for the GOSOC to survive, whereas others believe X. And for these following scientific reasons, we go with X. It's just not in there for anyone to read, for the public to read. And isn't the whole purpose of NEPA to inform the public? The whole purpose of NEPA is to inform the decision-maker, and part of that is to inform the public. To disclose to the public what the decision is in our... That's correct, Your Honor. And that was done in this case by... To point to the language where this debate is disclosed. Well, it was... Tell me which document. In the final EIS, includes on the Game and Fish letter, which is at page 5 ER... Is that in the appendix? Yes. Well, I'm saying where in the document. NEPA doesn't say the appendix. It says the document. Well, in the document, the document describes... Where? ...that there's multiple alternatives throughout where it describes the alternatives at the beginning of the document. If you want me to cite where it says, there's a debate about habitat generalists versus habitat specialists, it's not phrased in that term. It says, we have... Our preferred alternative is alternative C and then ultimately alternative G. The Game and Fish agencies, through this other interagency team, developed a different alternative. And side-by-side throughout the document, it compares those two alternatives. So ultimately, if a reader was interested into, well, why is there this difference between the alternatives? Why are the Game and Fish agencies sponsoring one and the Forest Service sponsoring another? The reader is free to go to the appendix and read the Game and Fish letter that's published in the appendix. They can read all their comments about the alternatives, comparing them. Why doesn't NEPA require you to say what it is in the document? Well, it's just a matter of how... Instead of making these vague general... In order to go... In order to rule in favor of your position, we have to have a rule that says these sort of general references to materials in the appendix satisfy the requirements of NEPA. No, Your Honor, because the plaintiffs are now phrasing this debate as if it's not enough that it's the way that it was described by comparing the alternatives. The CQ regs say one of the ways to address that is by putting in an alternative, and the agency did that. They referenced the papers. If someone wanted to go back to the dispute that predated the draft environmental impact statement, they can do that. The fact that it's referenced on page 5ER of 1139, which is the appendix to the letter from the Game and Fish Department, and it references that there's a white paper prepared by Arizona Game and Fish Department, and it references the Forest Service's response, and it says these are in the record. If someone was so interested in what that debate was about, they could have asked the Forest Service. There's no evidence in the record that the Forest Service wouldn't have immediately presented those papers to any member of the public so that they could compare. So the gist of the argument is laid out here in the NEPA document by presenting the alternative by publishing the letter that's in the EIS itself. This court in the city of Carmel by the state. Where is the letter? The letter? The letter's in the appendix. The reference I was just making was to page 1139. Are you talking about the November 30, 1994 letter that was written? Yes. That said that the draft EIS did not discuss the controversy. The absence of any analysis calls into question the Forest Service's conclusion that implementation of the management alternatives will have no significant effect. That's the letter. Yes. Okay. So where does the response to that appear in the final EIS? The response is that the service took, the Forest Service took the alternative that was presented by the Game and Fish Agencies and put it right verbatim into the final EIS and put them side by side. And they analyzed both those alternatives. They increased their analysis as to the effects on the species, the effects on other aspects of the environment. It's just by comparing the two alternatives and analyzing it throughout the whole final EIS, it's all there. It may not be as blunt as you would have liked it, but that doesn't mean it's not a reasonable approach. And the CQ regs specifically say one of the ways to address concerns is by presenting alternatives. Mr. Smith, I need to follow your argument just a little more slowly. At 1139, all I have is the Arizona Game and Fish Department white paper. Right. I don't, Dr. What's-His-Name answered that, but I don't know that I have a letter. I don't have a letter at 1139. At 1139 is Appendix C to the Arizona Game and Fish Department letter. Right. That's the white paper. Wait, it's not Appendix C to the letter. As I understand the note there, what it's telling me is that the Arizona Fish and Game Department prepared a white paper. The Forest Service prepared a response. We're not printing either one of them because they're too bulky. Right. And that's it. Right. Does the record show how bulky they were, incidentally? They're in the record. I mean, I couldn't tell you offhand. Remind me. I get lost in this thing. This is one of them. This is also bulky anyway. I don't understand why it's not just here. Maybe it wasn't the best approach. Maybe it would have been nice had they published it, but that doesn't make it an unreasonable approach. This Court has time and again held that an agency doesn't have to publish everything, every comment in the final EIS. In City of Carmel v. By the Sea v. Department of Transportation, is this letter at page 772, is that the letter that's left out because it's too bulky or is the reference to something else? I don't have 772 with me, Your Honor. That's the letter I just asked you about, the November 30th. Oh, it's also at 772. You didn't bring your excerpts? I have them, but not all of them at my table, Your Honor. But what it is, that's not what was left out. What was left out was the white paper which was attached. The white paper was prepared in 1993. It's a more lengthy paper than the Forest Service did a response. So you put this Cartwright letter in the final EIR? Excuse me? The letter to Cartwright was in the final EIR? That's correct. No, it's not. It's not. The letter to Cartwright from Crocker Bedford? Somebody named Crocker Bedford writing to Cartwright. I thought we were talking about the Game and Fish. You've been talking about this November 30, 1994 letter. You said that it was in the final EIR, but its attachment was not. I was talking about the November 30, 1994 letter by the Game and Fish Department. Okay. Apparently Crocker Bedford's letter is... Yes, he did write one too. Okay. Right, I know he did. I didn't know that. The date was the same. I thought we were referring to the same letter. Okay. Well, the Game and Fish Department letter, now was that in the final EIR? Yes. And where was that? That's at page... It begins at page 1119. That's where it is in the final EIR, EIS. So the letter is in there. Their description of why they were presenting the white paper as a comment on the draft EIS is in their letter. They explain why we're presenting the white paper, and that's later in their letter at page 1123. They say, So they give you on their draft EIS comment why they're attaching the white paper. So if I'm a member of the public, I can read that. I can go to the appendix. The white paper's not there. It says it's in the public record. Anyone can ask the floor service for that. And this Court has upheld that time and time again in cases that not everything not every study, not every paper has to be reprinted in the EIS as long as it's referenced. But don't you think the fundamental debate, again, ought at least be disclosed? And we believe that it was by presentation of an alternative that reflected that other debate view. And talk to us about the substance of that, because what we're hearing from the appellant here is you basically were at one position in terms of protecting old and mature growth with your management recommendations. And that was 20 percent in each of the various stages. And that never changed. It was tweaked a little bit, but, yes, generally that's true. And so why is it that alternative D represents a different view in terms of protecting a goshawk if you believe the notion that it is not a generalist, it's habitat specific? Because what it does, the main difference is that it protects, it talks about, one, it increases the amount of old growth that's protected. It increases the canopy levels to some degree. But the main difference is that it seeks to protect old growth in large patches, whereas the Forest Service alternative talked more about small patches. It wasn't a matter of how much. Both agencies, the agencies agreed that you had to protect old growth for the goshawk. It was just a matter of what, where, how much, and how big a patch is. The difference was, is that the Game and Fish agencies wanted to protect large patches. And the Forest Service believed that it was small patches were the better approach for going for goshawks because goshawks could use more of the edge areas, the transition areas between different forest types to forage. So that's how it was presented. It's presented as an alternative. As I read at the beginning of my argument, the Game and Fish agency repeatedly said, this satisfies the habitat needs of the goshawk. If they had a different view that it needed more, they weren't shy about presenting their criticisms to the agency. They would have said, hey, you're not getting the picture here. We went along with this, but we still think you need more. You should have done another alternative. And plaintiffs concede that they didn't present an alternative to the Forest Service. And the Supreme Court in Vermont Yankee says you can't argue in your comments that there ought to be another alternative considered and not present that alternative and then go into court and say, Your Honors, they didn't consider this alternative. I mean, the Supreme Court's address, the Forest Service believed, I think it's clear from here, they believed that they were presenting an alternative that represented the alternative view of the state agencies. And the state agencies give every indication that they agreed with that conclusion by the Forest Service. But I assume my time is up if there are no further questions. Thank you, Counsel. Counsel. Thank you. Your Honors, your attention has been brought to the inclusion of the Arizona Game and Fish comment letter in this document. When this document was redacted from the printing of the environmental impact statement, the only text that was presented there besides the title was this document was prepared by the Arizona Game and Fish Department. And I quote, The Forest Service conducted an extensive review in 1994. Both documents have been included in the planning record, but because of their extensive size, they're not reprinted in the final environmental impact statement. This statement. The letter on 1119. That is 1139 is where that statement, but it begins at 1119. That is it. The Forest Service claims that a reader could take from this, this important debate. It doesn't say anything whether or not the Arizona Game and Fish Department agreed with the assumptions and the management recommendations. It doesn't say if they disagreed or agreed or whether the Forest Service's extensive review of the subject agreed or disagreed. It doesn't even present the reader with the fact that it was a debate or a dispute. In fact, a reader would look at this and feel that there's nothing interesting in this document because had there been something interesting, it would have been included or else it would have been substantively summarized. The regulations are clear, Your Honor. It's not a flexible standard. And this Court's reading of the regulations in decisions like Blue Mountains Biological Diversity and in the Seattle Audubon Society confirms the fact that the Forest Service must present its response to reasonable opposing views in the environmental impact statement, not an interagency memorandum. Counsel, it's counting up now past your having run out of time. I do want to get your response about this alternative issue because what I hear from the government is that the alternative supported by Arizona and New Mexico, alternative D, was in fact completely satisfactory to them with regard to serving the needs of the goshawk as it was regarded as a habitat-specific species. Your Honor, the quote that was presented to you before in the letter in which it said the Forest Service's use of Appendix D would address many of the concerns. It's just that, many of the concerns. It doesn't say it addresses the forging habitat concern. And to that letter, the Arizona Game and Fish Department still attached its white paper, it still attached its review. Thank you. Thank you, Counsel. If Your Honor has any further questions, thank you. The Center for Biological Diversity is submitted.
judges: Kleinfeld, Wardlaw, Pogue